Filed 11/30/15  P. v. Sanchez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062536 |
| v. | (Super.Ct.No. RIF1303184) |
| BENJAMIN FELIX SANCHEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Christian F. Thierbach, Judge.  Affirmed.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Charles C. Ragland and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Benjamin Felix Sanchez was separated from his wife. He suspected that she was having an affair with a man named Victor. When he learned that someone named Victor was at the family home, painting a bedroom, he went over there, taking his gun tucked in his waistband. There was a confrontation. Defendant fired the gun three times. Victor was shot and wounded; defendant's wife was shot and died.

A jury found defendant guilty of first degree murder (Pen. Code, §§ 187, subd. (a), 189), with an enhancement for causing death by personally and intentionally discharging a firearm (Pen. Code, § 12022.53, subd. (d)). It also found him guilty of willful, deliberate, and premeditated attempted murder (Pen. Code, § 187, subd. (a), 664, subd. (a)), with an enhancement for personally using a firearm (Pen. Code, § 12022.5, subd. (a)). He was sentenced to a total of 54 years to life in prison, along with the usual fines, fees, and directives.

Defendant now contends that:

1. Defense counsel rendered ineffective assistance by:

a. Failing to request an instruction that provocation can reduce first degree murder to second degree murder. (E.g., CALCRIM No. 522.)

b. Failing to object to prosecutorial misconduct in closing argument.

2. The trial court erred by admitting gruesome photos of defendant's wife's dead body.

We find no error. Hence, we will affirm.

2

I

FACTUAL BACKGROUND

A.     *The Prosecution's Case.*

Defendant was married to Yara Sanchez; they had three children.  In 2012, Yara

began having a "romantic relationship" with a coworker, Victor Bermudez.[1]

Around the beginning of April 2013, defendant and Yara separated.  Defendant

went to live with his brother Rafael.  The children stayed with Yara during the week and

with defendant on weekends.

On Saturday, April 27, 2013, Yara dropped the children off to defendant at a 7-

Eleven.  Defendant then drove them to his brother's house.  On the way there, the

children mentioned that someone named Victor was painting a room in their house.  After

taking a shower and spending some time with the children, defendant left, saying he was

going to the store.  He took a lunch bag with him.

Meanwhile, Yara went back home.  Around 3:40 p.m., Victor showed up to paint

the spare bedroom.  While he was painting, she did laundry and washed her car.  Victor

locked the bedroom door so she would not open it and bump into him.

---

[1]     We use first names for Yara and other members of defendant's family to keep them distinct, as well as to be consistent with the reporter's transcript.  We use Victor's first name to be consistent with this usage and, again, to be consistent with the reporter's transcript.

Around 4:20 p.m., there was a knock on the bedroom door. Victor opened the door and saw defendant, with Yara standing to his side and a little behind him. Defendant asked if he was Victor; he said yes.

Defendant then lifted up his shirt, revealing a gun in his waistband, and reached for the gun. Victor shut the door, then lay down in front of it to hold it closed with his feet. Victor heard Yara say, "Really? That's what you are gonna do?" At this point, he did not hear any shots. Defendant tried to force the door open while Victor tried to keep it closed; finally, defendant managed to kick it open, breaking off the lower third. They wrestled for the gun; it went off, firing toward the ceiling.

Victor hit defendant, knocking him down, then started running away, down the hallway and out the front door. As he was running, he realized that Yara was lying on the floor. Defendant fired two shots. One hit Victor in the back of the right thigh and exited through the front. Another grazed the back of his head.

Defendant walked out of the house, got into his pickup truck and drove away. Victor then called 911.

The police arrived at about 4:30 p.m. They found Yara's dead body lying in a corner in the hallway. A single bullet had entered her left rear neck and exited through the right front jaw, severing her spinal cord. She would have lost the use of her legs "instantaneous[ly]"; she would have died within "a matter of seconds, maybe a minute."

The police also found three empty bullet casings — two in the hallway and one in the front entryway. They found bullet holes and strike marks that were consistent with

4

three shots. One bullet had entered the ceiling of the spare bedroom. One bullet had gone through the door of the spare bedroom and into the master bedroom. And one bullet had gone across the front entryway, breaking a kitchen window.[2]

A few days after the shooting, the wife of defendant's brother Tomas found items in her van that did not belong to her. She called the police. The items in the van included $1,500 in cash and a suitcase that belonged to one of defendant's children, containing children's clothing. They also included a lunch bag containing both a semiautomatic handgun and defendant's work identification badge. The gun was registered to defendant. Testing revealed that this gun had fired all three casings found at the crime scene.

Inside defendant's truck, the police found his children's birth certificates.

Defendant's sister Olivia Sanchez testified that, on the day of the shooting, defendant came to her house. He told her that he "accidentally" took out his gun to "make [Yara] be afraid" and it "shot on its own."

B.    *The Defense Case*.

Defendant testified that, before the separation, Yara would stay out all night, claiming that she had to work overtime and she would be staying with a girlfriend.

---

**2**    In the prosecution's view, defendant shot Yara in the hall, while the bedroom door was closed. The defense theory was that the bullet that hit Victor's thigh could also have been the one that killed Yara. The parties have not provided us with any photos, diagrams, or other exhibits, so we cannot say whether the bullet holes and strike marks were consistent with either of these scenarios.

However, her pay stubs were inconsistent with the amount of overtime that she claimed to be working. She also started locking her cell phone. When she forgot to lock it, however, defendant found sexually tinged messages from a person named Victor. He confronted her, but she denied having an affair.

On the day of the shooting, when defendant learned that someone named Victor was painting his house, he was angry. On a scale from one to ten, he was at an eight. He went to Yara's house to try to find out if the man who was painting was involved with Yara. He admitted taking his lunch bag. However, he denied having his gun in the lunch bag; he testified that the gun was already in his truck, because that was where he kept it. He did not remember putting the gun into his waistband.

When defendant arrived, his anger was "the same, an eight or a seven." Yara gave him the children's birth certificates, because he needed them to get insurance. At first, she said she was waiting for a painter. However, when defendant said he had to get some mail from inside the house, she said the painters were already there. Defendant said, "Let me see. I want to see them."

When defendant found Victor in the bedroom, he asked Yara, "[I]s this your boyfriend? Your lover?" She said, "Yes." He asked her to tell Victor to leave, but she said, "No. You leave." "And that's . . . when I lost it," defendant testified. It was "like it was a dream. . . . I saw the man running, and then I started shooting at him, just at the corners of his feet." Defendant denied wanting to hurt Victor; he claimed that he just wanted to "scare him away so that he would leave."

6

Defendant saw Yara lying on the floor but did not realize that she had been "fatally" shot. He could not explain why he did not check on her.

After the shooting, defendant drove to his brother Tomas's house. On the way there, he put the gun in his lunch bag, but he did not remember putting the lunch bag in the van. Next, he drove to the home of his sister Olivia and told her about the shooting. Finally, he turned himself in.

## II

## FAILURE TO REQUEST AN INSTRUCTION THAT PROVOCATION
## CAN REDUCE FIRST DEGREE MURDER TO SECOND DEGREE MURDER

Defendant contends his trial counsel rendered ineffective assistance by failing to request an instruction that provocation can reduce first degree murder to second degree murder. (E.g., CALCRIM No. 522.)

The jury was instructed that provocation can reduce murder to voluntary manslaughter. (CALCRIM No. 570.) It was also instructed on second degree murder. (CALCRIM Nos. 520 & 521.) However, it was not given CALCRIM No. 522. CALCRIM No. 522, as it relates to second degree murder, would have stated: "Provocation may reduce a murder from first degree to second degree. . . . The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

CALCRIM No. 522 is a "pinpoint" instruction, meaning that the trial court is not required to give it except on request. (*People v. Rogers* (2006) 39 Cal.4th 826, 877-880 [discussing CALJIC No. 8.73, the predecessor of CALCRIM No. 522].)

"'To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.' [Citation.]" (*People v. Johnson* (2015) 60 Cal.4th 966, 979-980.)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. . . . On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Defense counsel was never asked to explain his decision not to request CALCRIM No. 522. Thus, the issue before us is whether there could be a satisfactory explanation for this. It could have been a reasonable tactical decision, because there is a much greater difference in punishment between second degree murder and manslaughter than there is between first degree murder and second degree murder. The penalty for first degree

8

murder is 25 years to life in prison. The penalty for second degree murder is 15 years to life in prison. (Pen. Code, § 190, subd. (a).) By contrast, the penalty for voluntary manslaughter is only three, six, or eleven years in prison. (Pen. Code, § 193, subd. (a).)

Even more important, on count 1, along with murder, defendant was charged with an enhancement for causing death by personally and intentionally discharging a firearm, which entailed "an additional and consecutive term of imprisonment in the state prison for 25 years to life." (Pen. Code, § 12022.53, subd. (d).) If defendant was convicted of manslaughter rather than murder, this enhancement could not apply. (See Pen. Code, § 12022.53, subd. (a) [specifying crimes to which enhancement applies].) The only other enhancement to count 1 that was pleaded was an enhancement for personally using a firearm, which entailed an additional and consecutive term of three, four, or ten years. (Pen. Code, § 12022.5, subd. (a).)

In sum, then, if defendant was convicted of either first or second degree murder, he was looking at a minimum of 40 years to life in prison, just on count 1. If he was convicted of manslaughter, however, he was looking at a minimum on count 1 of 6 years and a maximum on count 1 of 21 years (plus some term of years on an attempted voluntary manslaughter conviction on count 2, although this could have been run concurrently and/or could have been calculated as one-third the midterm; see Pen. Code, § 1170.1, subd. (a); but see Pen. Code, § 1170.16). Thus, defense counsel could rationally decide to urge the jury to return a verdict of voluntary manslaughter, rather than second degree murder, based on provocation.

We conclude that defendant has not shown that the failure to request CALCRIM No. 522 constituted ineffective assistance.

## III

## MISSTATING THE LAW IN CLOSING ARGUMENT

Defendant claims that the prosecutor committed misconduct in closing argument by misstating the law regarding provocation.

A.     *Additional Factual and Procedural Background.*

In his main closing argument, the prosecutor stated:

"[K]eep in mind . . . that there is a strict standard to this, that the defendant had to be provoked.  And because he was provoked, he acted under an intense emotion. . . . Were you not thinking?  Were you just seeing red? . . .  [I]ntense emotion, not just angry. Not annoyed or upset or frustrated.  And intense emotion, where you are not thinking about what you are doing.  You are just reacting.

"And that provocation would have caused . . . a reasonable person, so an average person, not Mr. Sanchez, but an average person, *to react in the same way*."  (Italics added.)

In his rebuttal, he stated:

"So the . . . provocation here is Victor is at his house painting.

"There is another element, though, that because he was provoked, he acted under an intense emotion that obscured reasoning and judgment, again, that he wasn't thinking.

And we have heard from the evidence that he was thinking, that he was considering different things.

"It wasn't a situation where he was seeing red.  Mr. Sanchez doesn't qualify under this element, because he was thinking, he did have a rationale, where he was going to shoot — if you want to believe his testimony — where he was going to shoot, what he was going to say to Yara, things like that.  He — his mind was working.  His mind was angry, but his mind was working.  There was reasoning and judgment there.

"And the provocation could have caused a reasonable person *to react the same way. . . .*

"An average person who has just a suspicion that the person is at the house painting[] is not going to be overcome with seeing red, be blinded with emotions where they are not thinking clearly."  (Italics added.)

He also stated:  "So the average person in the same set of facts, same situation. *They would not act like this*."  (Italics added.)

Finally, he stated:  "This was a crime that he thought about before he did it.  The law says he can't act out of thinking with rationale, for voluntary manslaughter.  That's why it doesn't fit.  This is a crime where the average person *would not be provoked to this level of rage*."  (Italics added.)

Defense counsel did not object at any point.

B.    *Analysis*.

"'""A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury."'" [Citation.]" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1331-1332.)

"'[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error.' [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

Defense counsel forfeited defendant's present contention by failing to object at trial.  "[I]n order to preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection to the alleged misconduct and request the jury be admonished to disregard it.  [Citations.]" (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1339.)  Defendant argues, however, that defense counsel's failure to object constituted ineffective assistance of counsel.  We will address the issue under this rubric.

"[I]t is misconduct for a prosecutor, during argument, to misstate the law [citation] . . . ." (*People v. Whalen* (2013) 56 Cal.4th 1, 77.)  "'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an

12

improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' [Citation.]" (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1337.)

In *People v. Beltran* (2013) 56 Cal.4th 935, the Supreme Court held that the test of whether provocation is legally adequate to reduce murder to voluntary manslaughter is *not* whether, as a result of the provocation, "an ordinary person of average disposition would *kill* . . . ." (*Id.* at p. 949.) "[S]ociety expects the average person not to kill, even when provoked." (*Ibid.*) Rather, it is whether an ordinary person of average disposition would "react from passion and not from judgment." (*Id.* at p. 939.) "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Id.* at p. 949.)

The prosecutor's argument was perfectly consistent with this legal standard. In his main closing argument, he said that the provocation must have caused defendant to "act[]" under an intense emotion," "where [he is] not thinking about what [he is] doing"; he then

13

said that the provocation must also have been such as to would have caused an average person "to react in the same way."

Likewise, in his rebuttal closing argument, he said that the provocation must have caused defendant to "act[] under an intense emotion that obscured reasoning and judgment, so that "he wasn't thinking," "he was seeing red"; and it must have been such as "could have caused a reasonable person *to react the same way. . . .*" He specifically argued that this test was not met because "[a]n average person who has just a suspicion that the person is at the house painting[] is not going to be overcome with seeing red, be blinded with emotions where they are not thinking clearly." He also said that the test was not met because "the average person would not be provoked to this level of rage."

Arguably, the prosecutor's references to whether the average person would "react in the same way" or "would . . . act like this," were ambiguous, standing alone. But they did not stand alone. In context, "the same way" and "like this" referred back to the prosecutor's immediately preceding discussion of the required subjective reaction. The prosecutor *never* said that the provocation had to be such as would induce an ordinary or reasonable person *to kill*.

Because there was no prosecutorial error, defense counsel did not render ineffective assistance by failing to object.

14

IV

THE ADMISSION OF PHOTOS OF YARA'S DEAD BODY

Defendant contends that the trial court erred by overruling his objection to certain assertedly gruesome photos.

A.    *Additional Factual and Procedural Background.*

Before trial, defense counsel objected to Exhibits No. 13, 15, 71, 72, 73, 74, and 75 under Evidence Code section 352.  They were described as photos of Yara's wounds that were taken either at the crime scene or at the autopsy.  He argued that they were both gruesome and cumulative.

The prosecutor withdrew Exhibit No. 13.  However, he argued that the other photos were necessary to show the path of the bullet and/or to illustrate the findings in the autopsy report.

The trial court overruled the objection with respect to Exhibits No. 15  and 75.  Regarding Exhibits No. 71 through 74, however, it said, "Pick two of these four . . . ."  The prosecutor chose to use Exhibits No. 71 and 73.  Thus, he withdrew Exhibits No. 72 and 74.

During trial, there was no testimony about Exhibit No. 15.  The prosecutor, however, had described it as showing the exit wound.

The autopsy physician testified that Exhibit No. 71 showed his dissection of Yara's back. Exhibit No. 73 showed that Yara's spinal cord had been severed.[3] Exhibit No. 75 showed the path of the bullet.

Exhibits No. 15, 73, and 75 were admitted into evidence. Exhibit No. 71 was never actually admitted.

B.  *Discussion.*

""""The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]' [Citation.]" [Citations.] . . . Autopsy photographs are routinely admitted to establish the nature and placement of the victim's wounds and to clarify the testimony of prosecution witnesses regarding the crime scene and the autopsy, even if other evidence may serve the same purposes. [Citation.]' [Citation.]" (*People v. Bryant* (2014) 60 Cal.4th 335, 423.)

Defendant's contention stumbles at the threshold because he has not provided us with an adequate record. He has not asked that the assertedly gruesome photos be included in the clerk's transcript. (See Cal. Rules of Court, rule 8.122(a)(3), (b)(3)(B).) He also has not asked that they be transmitted to us. (See Cal. Rules of Court, rule

_____

**3**  The trial court commented, "In all the years I've been doing these, this one is the grossest of them all."

16

8.224.)  Even though "all exhibits . . . are deemed part of the record . . ." (Cal. Rules of Court, rule 8.122(a)(3)), we have no way of reviewing any exhibit unless it is physically provided to us via one of these routes.  "It is axiomatic that it is the burden of the appellant to provide an adequate record to permit review of a claimed error, and failure to do so may be deemed a waiver of the issue on appeal." (*People v. Akins* (2005) 128 Cal.App.4th 1376, 1385.)  Without actually seeing the photos, we can hardly say they were more prejudicial than probative, nor can we say it is reasonably probable that, if they had been excluded, the outcome would have been more favorable to defendant.

Separately and alternatively, the trial court did not abuse its discretion.  There was a serious issue as to whether defendant could have shot Yara accidentally, either when he and Victor were struggling over the gun or when he was shooting at Victor.  Moreover, defendant claimed that he was aiming "at the corners of [Victor's] feet."  Accordingly, the exact path of the bullet that killed Yara was highly relevant.  Admittedly, the autopsy physician could have testified to this.  However, "prosecutors . . . are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case. [Citations.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 624.)

Here, as in *People v. Ramirez* (2006) 39 Cal.4th 398, "[t]he record reflects that the experienced trial judge was well aware of his duty to weigh the prejudicial effect of the photographs against their probative value, and carefully did so. [Citation.]" (*Id.* at p. 454.)  The trial court acknowledged that the photos were graphic, and even that one of

them was "the grossest of them all." However, it reduced the potential prejudice to defendant by admitting only four of the prosecution's original seven proffered photos.

Defendant claims that the trial court itself found that Exhibit No. 73 was not relevant to any issue. Not so. Rather, during the argument, it asked the prosecutor, "Why do you think the jury needs to see the severed spinal cord? I mean, you're putting the doctor up there to establish the cause of death. *There's really no issue*." (Emphasis added.) Clearly it was suggesting that the cause of death was not a *disputed* issue, and hence that the photo was cumulative to the autopsy physician's testimony. Moreover, at that point it was not addressing whether the photo might also be relevant to any other issues. It evidently became convinced by the end of the argument that the photo did have substantial probative value.

"'As [the Supreme Court] ha[s] previously noted, "'murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant.'"" [Citation.]" (*People v. Cunningham* (2015) 61 Cal.4th 609, 668.) At least from the descriptions of the photos that are contained in the reporter's transcript, we cannot say that they were "of such a nature as to overcome the jury's rationality. [Citation.]" (*People v. Montes* (2014) 58 Cal.4th 809, 862.) The trial court therefore could exercise its discretion in favor of admitting them.

V

DISPOSITION

The judgment is affirmed.

18

NOT TO BE PUBLISHED IN OFFICAL REPORTS

RAMIREZ
P. J.

We concur:

KING
J.

MILLER
J.